UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| STATE OF MISSOURI *ex rel.* CATHERINE L. HANAWAY, Attorney General of the State of Missouri, and MERYLN JOHNSON, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 4:26-cv-00171-SRC |
| MISSOURI STATE HIGH SCHOOL ACTIVITIES ASSOCIATION, | ) | |
| Defendant. | ) | |

**Memorandum and Order**

Missouri State High School Activities Association ("MSHSAA") decided that Merlyn Johnson—a Superintendent of Caseville R-IV School District—wasn't eligible for a seat on its Board because he is a white male. The State of Missouri and Johnson sued MSHSAA for allegedly violating federal law prohibiting race and sex discrimination. MSHSAA moves to dismiss. For the reasons stated below, the Court grants MSHSAA's motion in part.

## I. Factual background

The Court accepts the following well-pleaded facts as true for the purposes of deciding MSHSAA's motion. Merlyn Johnson—a "Caucasian, non-Hispanic male"—is the "Superintendent of Cassville R-IV School District." Doc. 1 at ¶¶ 28–29. MSHSAA is "a voluntary, nonprofit, educational association of secondary schools" that "develop[s] and adopt[s] standards of supervision and administration to regulate the diverse interscholastic activities and contests which are delegated by the member schools to the jurisdiction of [MSHSAA]." *Id.* at ¶ 52 (internal citation omitted). "MSHSAA's members are Missouri schools." *Id.* at ¶ 53.

Member schools annually renew their membership and pay a fee. *Id.* at ¶ 54. And "[f]or public schools, this request for membership and annual fee are approved by the public-school board." *Id.* "Member schools elect board members from eligible candidates for their respective membership district and respective at-large region," and they "vote and approve amendments to MSHSAA's Constitution." *Id.* at ¶ 55. MSHSAA employs "more than fifteen employees[,]" and they are "eligible for membership in the state-retirement system." *Id.* at ¶¶ 59–60. And its "major revenue sources are ticket sales from tournaments and festivals as well as activity participation and tournament registration fees." *Id.* at ¶ 58.

Typically, "the Board includes ten elected directors." *Id.* at ¶ 63. "Eight directors are district members, each from one of the eight membership districts." *Id.* at ¶ 64. These eight district-member directors must "be active school superintendents, principals, or activities directors of member schools in good standing in their respective districts." *Id.* (citation omitted). The remaining two elected directors are "elected from two different at-large regions." *Id.* at ¶ 65. In addition to meeting the "same professional standards as the district member directors[,]" "[e]ach of two [a]t-[l]arge positions [must] be filled by a candidate representing the under-represented gender of the current Board, or an under-represented ethnicity." *Id.* (citation omitted). Plaintiffs claim that "[g]iven the Board's leadership role, decisions of the Board affect MSHSAA's statewide policy as well as MSHSAA's employees." *Id.* at ¶ 66.

In 2025, "Johnson was a nominee for the MSHSAA Board of Directors for the [a]t-[l]arge Region 2 board seat." *Id.* at ¶ 30. At the time, "MSHSAA's Board had a majority of male and white, non-Hispanic members." *Id.* at ¶ 31. Plaintiffs aver that "MSHSAA rejected Dr. Johnson's candidacy solely because of his race and sex." *Id.* at ¶ 32. MSHSAA sent Johnson an email stating that the Board, "after taking out members whose terms are up, has a

majority of males." Doc. 1-2 at 13 (The Court cites to page numbers as assigned by CM/ECF.); *see also Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010) (citing *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999)) ("The court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record."). And because Johnson is "a male," he did "not meet this requirement." Doc. 1-2 at 13. Unless Johnson identified with a "minority ethnicity or race group," he wasn't "eligible to be a candidate for this seat." *Id.*

Johnson then "contacted the State Auditor regarding his disqualification." Doc. 1 at ¶ 80. "The State Auditor then sent inquiries to MSHSAA, asking the organization to confirm its policy with respect to the at-large board seats and explain why its policy was not discriminatory." *Id.* at ¶ 81; *see* doc. 1-2 at 4. MSHSAA responded that its "constitutional language related to at-large board positions is deliberately designed to promote inclusivity while avoiding any form of exclusion or rigid identity-based quotas. **It expands access, rather than restricts it**." Doc. 1-2 at 8 (emphasis in original). After the State Auditor raised Johnson's disqualification, doc. 1-2 at 11–12, MSHSAA distinguished "between a structural seat requirement and an outright bar to board service":

> Johnson[] was not and is presently not precluded from serving on the MSHSAA Board of Directors. Rather, he was unable to run for a particular at-large seat because he did not meet the current qualifications attached to that seat pursuant [to] MSHSAA's Constitution. Mr. Johnson remains eligible to run for election to a seat representing his own region, where his service as an administrator would qualify him under the governing bylaws . . . . The fact that a candidate is disqualified from a given seat does not equate to a prohibition on board service altogether, but rather reflects the seat-specific qualifications that all candidates must meet.

Doc. 1-2 at 14. In November 2025, the State Auditor "referred the results of his investigation of Dr. Johnson's complaint to the [Missouri] Attorney General." Doc. 1 at ¶ 93; doc. 1-2 at 2–3.

## II. Procedural background

A few months later, the State of Missouri and Johnson sued MSHSAA, arguing that it "violated federal law prohibiting race and sex discrimination." Doc. 1 at 1. Johnson asserts that MSHSAA engaged in unlawful race and sex discrimination prohibited under 42 U.S.C. § 1983, doc. 1 at ¶¶ 98–125, and that MSHSAA denied him the "full and equal benefit of all laws" under 42 U.S.C. § 1981, doc. 1 at ¶¶ 145–52. Missouri joins Johnson's Section 1981 claim. Doc. 1 at ¶¶ 145–52. But Missouri separately asserts that MSHSAA's conduct violated the Equal Protection Clause of the Fourteenth Amendment, *id.* at ¶¶ 126–34, and violated Title VII of the Civil Rights Act of 1964, *id.* at ¶¶ 135–144. Two months after Plaintiffs filed this suit, the United States moved to intervene on their behalf, docs. 16, 17, which the Court granted, doc. 28. And two weeks after the United States moved to intervene, MSHSAA moved to dismiss this case for improper venue. Doc. 22.

A month after that, MSHSAA moved to stay this case. Doc. 31. Having reviewed the parties' briefing, docs. 32, 33, the Court declines to exercise its "broad discretion to stay proceedings," *Clinton v. Jones*, 520 U.S. 681, 706 (1997). The Court therefore denies MSHSAA's motion to stay, doc. 31, and takes up its motion to dismiss.

MSHSAA argues that "[t]he entire [c]omplaint should be dismissed for improper venue" or transferred to the Western District of Missouri. Doc. 22 at ¶¶ 5, 11. And that according to MSHSAA, "[a]side and apart from venue issues," Missouri "cannot participate in his case because of a lack of subject[-]matter jurisdiction." *Id.* at ¶ 12. Finally, MSHSAA argues that the Court should dismiss "Counts III and IV with prejudice as to all parties for failure to state a claim upon which relief can be granted." Doc. 22 at 4.

But because "Article III standing is a threshold question in every federal court case[,]" *United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1013 (8th Cir. 2003), the Court first turns to address MSHSAA's challenge to the Court's subject-matter jurisdiction. *See Neirbo Co. v. Bethlehem Shipbuilding Corp.*, 308 U.S. 165, 167 (1939) ("The jurisdiction of the federal courts—their power to adjudicate—is a grant of authority to them by Congress and thus beyond the scope of litigants to confer."); 14D *Wright & Miller's Federal Practice & Procedure* § 3801 (4th ed. 2026) ("[S]ubject matter jurisdiction addresses whether a dispute may be heard by a federal court at all. If so, venue then determines which federal court—usually meaning *which* federal district—should hear the case.").

## III. Article III standing

### A. Standard

To resolve any case on the merits, a court must have jurisdiction to do so. That includes ensuring that the plaintiff satisfies the requirements of Article III standing. *Pucket v. Hot Springs Sch. Dist. No. 23-2*, 526 F.3d 1151, 1156–57 (8th Cir. 2008). Article III of the United States Constitution, by its own terms, limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992). That limitation, along with the corpus of federal constitutional standing caselaw that it animates, rests on a "single basic idea—the idea of separation of powers." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 422 (2021) (citation omitted). The separation-of-powers function of constitutional standing doctrine is simple: it "serv[es] to identify those disputes which are appropriately resolved through the judicial process." *Lujan*, 504 U.S. at 560 (citation omitted). And because standing doctrine performs that critical function, it constitutes "an essential and unchanging part of the case-or-controversy requirement of Article III." *Id.*

Federal courts are powerless to adjudicate disputes that do not qualify as "Cases" or "Controversies." *See id.* at 559–60; *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340–42 (2006). Standing doctrine enforces that case-or-controversy requirement. *See DaimlerChrysler Corp.*, 547 U.S. at 342. At the heart of standing doctrine is a core question: whether plaintiffs have a "personal stake" in the matter at hand. *Bost v. Ill. State Bd. of Elections*, 607 U.S. 71, 76 (2026). "As Justice Scalia memorably said, Article III requires a plaintiff to first answer a basic question: 'What's it to you?'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (quoting Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983)).

Sufficiently answering that question requires Plaintiffs to show that they satisfy three conditions: (i) that they have alleged a cognizable injury, (ii) that the injury is "fairly traceable to the defendant's allegedly unlawful conduct," and (iii) that the injury is "likely to be redressed by the requested relief." *California v. Texas*, 593 U.S. 659, 668–69 (2021) (citation omitted). Plaintiffs, as "the part[ies] invoking federal jurisdiction, bear[] the burden of establishing standing." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12 (2013) (cleaned up). Finally, because "standing is not dispensed in gross," Plaintiffs "must demonstrate standing for each claim they press against each defendant and for each form of relief that they seek." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (cleaned up). And "[a]t the pleadings stage, general factual allegations suffice to support standing." *Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1108 (8th Cir. 2022).

**B. Discussion**

MSHSAA argues that Missouri "has not and cannot demonstrate the concrete injury and genuine quasi-sovereign interest necessary to proceed" on its claims. Doc. 23 at 22. Plaintiffs

assert that the state has *parens patriae* standing to protect the interests of its citizens, particularly the children who are subject to MSHSAA's policies, from the adverse effects of discrimination. Doc. 26 at 9–18. For the following reasons, the Court agrees with Plaintiffs.

"*Parens patriae* is a common-law standing doctrine that permits the state to commence an action to protect a public interest, like the safety, health[,] or welfare of its citizens." *Lynch v. Nat'l Prescription Adm'rs*, Inc., 787 F.3d 868, 872 (8th Cir. 2015) (citation omitted). "Suits by a State, *parens patriae*, have long been recognized." *State of Ga. v. Pa. R.R. Co.*, 324 U.S. 439, 447 (1945); *see Missouri v. Illinois*, 180 U.S. 208, 231–36 (1901); *State of Ga. v. Tennessee Copper Co.*, 206 U.S. 230, 237 (1907). Missouri's "power is 'inherent in the supreme power of [the] [s]tate.'" *Lynch*, 787 F.3d at 873 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600 (1982) ("*Snapp*")).

"To invoke the doctrine, the Attorney General must prove a quasi-sovereign interest distinct from that of a particular party and injury to a substantial segment of the state's population." *Id.* at 872. The term "'quasi-sovereign' interest . . . is a judicial construct that does not lend itself to a simple or exact definition." *Snapp*, 458 U.S. at 601. "Its nature is perhaps best understood by comparing it to other kinds of interests that a State may pursue and then by examining those interests that have historically been found to fall within this category." *Id.* For instance, quasi-sovereign interests are "not sovereign interests, proprietary interests, or private interests pursued by the State as a nominal party." *Id.* at 602. "They consist of a set of interests that the State has in the well-being of its populace." *Id.*

"Although more must be alleged than injury to an identifiable group of individual residents, the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population." *Id.* at 607. "One

helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *Massachusetts v. E.P.A.*, 549 U.S. 497, 519 (2007) (citing *Snapp*, 458 U.S. at 607). For instance, "a State's interests in the health and well-being of its residents extend beyond mere physical interests to economic and commercial interests" and to an "interest in securing residents from the harmful effects of discrimination." *Snapp*, 458 U.S. at 609.

"Although the Supreme Court has suggested that 'States are not normal litigants for the purposes of invoking federal jurisdiction,' it has not eliminated the basic requirements for standing just because a state is the plaintiff[.]" *Missouri v. Yellen*, 39 F.4th 1063, 1070 n.7 (8th Cir. 2022) (citing *Massachusetts*, 549 U.S. at 518, 521–23). Even if Missouri is "entitled to some undefined 'special solicitude' in the standing analysis, [it] still must satisfy the basic requirements of Article III standing." *Missouri v. Biden*, 52 F.4th 362, 369 (8th Cir. 2022) (quoting *Yellen*, 39 F.4th at 1070 n.7). Meaning, though Missouri must satisfy the "irreducible constitutional minimum of Article III Standing[,]" *id.*, the *parens patriae* doctrine allows the state to invoke "the harms Missourians suffered" as its alleged concrete and particularized injury, *see Missouri ex rel. Bailey v. China*, 90 F.4th 930, 939 n.2 (8th Cir. 2024). But Missouri's "quasi-sovereign interest" must still be "sufficiently concrete to create an actual controversy between" Missouri and MSHSAA. *Snapp*, 458 U.S. at 602; *see also Iowa v. Wright*, 154 F.4th 918, 937 (8th Cir. 2025) (applying standard Article III standing doctrine to a state).

In its complaint, Plaintiffs state that "Missouri sues to vindicate its quasi-sovereign interest in securing its residents from the harmful effects of race and sex discrimination that MSHSAA has caused, is causing, and, if not stopped, will keep causing." Doc. 1 at ¶ 42.

"Therefore, Missouri has an interest, independent of the impacts that might accrue to any particular individual, in assuring that the benefits of the federal law are not denied to its general population." *Id.* at ¶ 45. And Missouri also sues, Plaintiffs claim, "to vindicate its quasi-sovereign interest in ensuring its residents are not excluded from the benefits that are to flow from, and hardships that are to be alleviated by, Title VII and Section 1981." *Id.* at ¶ 47.

MSHSAA first argues that Plaintiffs' "[c]omplaint points to an injury to one private individual (Dr. Johnson) and attempts to extrapolate from there a harm to the State's populace at large." Doc. 23 at 23. In MSHSAA's view, *Snapp* requires that Missouri "demonstrate harm to 'a sufficiently substantial segment of its population.'" *Id.* (citing *Snapp*, 458 U.S. at 607). But here, MSHSAA alleges that Plaintiffs' complaint "centers on a single, identifiable act: MSHSAA declined to consider Dr. Johnson for the [a]t-[l]arge Region 2 seat because the board had a majority of white, non-Hispanic males at the time." *Id.* MSHSAA therefore argues that Plaintiffs assert "a concrete and particularized injury to Dr. Johnson, not to the State's general population." *Id.*

Plaintiffs respond that MSHSAA "mistates [sic] the facts alleged in the Complaint." Doc. 26 at 13. Plaintiffs state that their complaint alleges that "MSHSAA maintains a statewide discriminatory policy that has injured, and continues to injure, Missourians across the State." *Id.* (citing doc. 1 at ¶¶ 65, 67, 76, 127). And Plaintiffs assert "that MSHSAA has maintained its discriminatory policy for years, and that it will continue to do so absent intervention." *Id.* (citing doc. 1 at ¶¶ 20, 36). Plaintiffs therefore argue that "MSHSAA attacks a strawman." *Id.* at 14. Plaintiffs concede that "if Missouri merely parrotted [sic] injury to Dr. Johnson and alleged *solely* injury to him, that might push *parens patriae* standing too far." *Id.* (citing *Snapp*, 458 U.S. at 607). But Plaintiffs argue that "Missouri alleges a fixed policy of discrimination that has

affected and will continue to affect Missouri citizens beyond Dr. Johnson." *Id.* (citing doc. 1 at ¶¶ 67, 81–97).

MSHSAA replies that Plaintiffs' argument "conflates the existence of a policy with the existence of a concrete, particularized injury." Doc. 30 at 5. While "[t]he State's [c]omplaint identifies a single person, Dr. Johnson, who was not selected as a candidate for an at-large board position[,] [i]t does not identify a single other Missourian who has applied for an at-large board position and been denied one on the basis of race or sex." *Id.* at 6. MSHSAA therefore argues that Missouri's injuries are "speculative or conjectural." *Id.* (citation omitted).

As stated above, "[a]t the pleadings stage, general factual allegations suffice to support standing." *Rydholm*, 44 F.4th at 1108. Missouri has met its burden. Missouri pleaded that "[a]t minimum, MSHSAA rejected Dr. Johnson" based on an alleged discriminatory policy. Doc. 1 at ¶ 67. But "[o]n information and belief, MSHSAA has rejected candidates for at-large board positions based on the candidates' genders and/or ethnicities." *Id.* The State Auditor "sent inquiries to MSHSAA, asking the organization to confirm its policy with respect to the at-large board seats and explain why its policy was not discriminatory." *Id.* at ¶ 81. And "[i]n response to the State Auditor, MSHSAA stood firmly behind its policy—providing detailed responses attempting to justify its discrimination for the at-large board positions." *Id.* at ¶ 82; *see id.* at ¶¶ 83–95.

Missouri has a quasi-sovereign interest "in securing residents from the harmful effects of discrimination." *Snapp*, 458 U.S. at 609. Missouri alleged an "injury to an identifiable group of individual residents," *i.e.*, Missourians that apply to the "two [a]t-[l]arge [Board] positions" allegedly face race and sex discrimination. Doc. 1 at ¶¶ 65, 127; *see id.* at ¶ 138; *Snapp*, 458 U.S. at 607. And the "indirect effects of" MSHSAA's policy also injure "a sufficiently

substantial segment of [Missouri's] population." *Snapp*, 458 U.S. at 607. MSHSAA's Board "adopt[s] standards of supervision and administration to regulate the diverse interscholastic activities and contests" for its "724 member schools, the majority of which are public schools." *Id.* at ¶¶ 52–53. The Board's decisions therefore indirectly affect "Missouri students" who "deserve to have the most qualified, most committed individuals working on their behalf[.]" Doc. 1-2 at 2. At this stage in the case, these "general factual allegations suffice to support standing." *Rydholm*, 44 F.4th at 1108.

To defeat Missouri's claim of *parens patriae* standing, MSHSAA argues that *Missouri v. Starbucks Corp.*, No. 4:25-cv-00165-JAR, 2026 WL 309714 (E.D. Mo. Feb. 5, 2026) "provides a thorough and directly applicable framework for evaluating" Missouri's standing in this case. Doc. 22 at ¶ 13; *see* doc. 23 at 22–26. While thorough, the Court disagrees that *Starbucks*'s *parens patriae* analysis is "directly applicable" here. *See Starbucks*, 2026 WL 309714, at *16 n.34 (noting that while "conceivable circumstances [exist] in which a state would possess a quasi-sovereign interest in protecting its populace from discrimination . . . [s]uch facts simply were not alleged *here*." (emphasis in original)).

In *Starbucks*, Missouri's allegations of harms to Missourians were speculative. *Starbucks*, 2026 WL 309714 at *13. As Judge Ross noted, Missouri's complaint was "unclear . . . whether any Missourian ha[d] actually been injured by Defendant's practices." *Id.* There, Missouri failed to "point to even a single Missouri resident who lacked 'Starbucks' preferred racial or sex characteristics' and suffered an adverse employment action as a result." *Id.* In contrast, Missouri here alleges a concrete example of alleged race and sex discrimination by MSHSAA. *See* doc. 1 at ¶¶ 65, 127, 138.

And in *Starbucks*, though Missouri "contend[ed] that its [C]omplaint establishes 'employment discrimination against thousands of people,'" Judge Ross explained that "the most the complaint establishes is that [Starbucks] employs a large number of Missourians." *Starbucks*, 2026 WL 309714 at *13. But here, Missouri pleaded that MSHSAA's policy allegedly harms its "724 member schools" and the children that attend these schools statewide. *Id.* at ¶¶ 52–53; doc. 1-2 at 2. And absent intervention, Missouri alleges that MSHSAA's policy has and will continue to harm Board applicants, member schools, and the children that attend those schools. Doc. 1 at ¶¶ 67, 81–97.

Finally, Missouri pleads that MSHSAA is a state actor, doc. 1 at ¶¶ 49, 100, 104, 131, 147, unlike Starbucks, which is a "well-known multinational coffee company[.]" *Starbucks*, 2026 WL 309714 at *1. The Court takes no position on the merits of MSHSAA's status at this time. *See Campbell v. Minneapolis Pub. Hous. Auth. ex rel. City of Minneapolis*, 168 F.3d 1069, 1074 (8th Cir. 1999) (stating that the standing inquiry is not a review of the merits of a case); *but see In re United State ex rel. Missouri State High Sch. Activities Ass'n*, 682 F.2d 147, 151 (8th Cir. 1982) ("Because MSHSAA is an association comprised primarily of public schools, its rules are state action governed by the [F]ourteenth [A]mendment."). Still, unlike *Starbucks*, Missouri's alleged injury is arguably one "of the State," that is, "an interest, independent of the benefits that might accrue to any particular individual, in assuring that the benefits" of federal law "are not denied to its general population" by MSHSAA. *Snapp*, 458 U.S. at 607–08.

The Court therefore finds that—on these facts—Missouri's quasi-sovereign interest "in securing residents from the harmful effects of discrimination" is a sufficiently concrete and particularized injury that would likely be redressable by declaratory and injunctive relief. *Snapp*,

458 U.S. at 609; *see Bailey*, 90 F.4th at 939 n.2. The Court now turns to MSHSAA's improper-venue challenge.

**IV. MSHSAA's 12(b)(3) motion**

MSHSAA argues that the Court should dismiss this case because proper venue lies in the Western District of Missouri. Doc. 23 at 10–19; doc. 30 at 2–4; docs. 34, 35. In the alternative, MSHSAA requests that the Court transfer this case to the Western District of Missouri under 28 U.S.C. § 1404(a). Doc. 23 at 19–21; doc. 30 at 4–5. Plaintiffs disagree. Doc. 26 at 28–35.

**A. Venue**

"Section 1406(a) and Rule 12(b)(3) allow dismissal only when venue is 'wrong' or 'improper.'" *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 55 (2013). And "[w]hether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws[.]" *Id.*

"This question—whether venue is 'wrong' or 'improper'—is generally governed by 28 U.S.C. § 1391." *Id.* Section 1391(a)(1) states that "this section shall govern the venue of all civil actions brought in district courts of the United States[,]" "[e]xcept as otherwise provided by law[.]" 28 U.S.C. § 1391(a)(1). Plaintiffs pleaded a Title VII claim. Doc. 1 at ¶¶ 135–144. And Title VII provides its own venue provision. 42 U.S.C. § 2000e-5(f)(3); *Laber v. Austin*, No. 4:21-cv-01323-MTS, 2022 WL 225615, at *2 (E.D. Mo. Jan. 26, 2022) (stating that "Title VII provides special rules for venue separate from the general venue rules"); *cf. Bredberg v. Long*, 778 F.2d 1285, 1287 (8th Cir. 1985) (stating that because "no special venue provision for FLSA claims [exist], so the general venue provisions of 28 U.S.C. § 1391 govern this case").

Though the parties spilled much ink debating which provision of § 1391(b) applies to this dispute, doc. 23 at 10–19; doc. 26 at 28–35, "[t]he clear majority view is that the venue

provisions of Title VII are exclusive, so the general venue provisions of Section 1391(b) do not apply." 14D *Wright & Miller's Federal Practice & Procedure* § 3825 (4th ed. 2026) (collecting cases); *see also* 17 *Moore's Federal Practice & Procedure* § 110.47 (stating that Title VII's "special venue statute . . . controls venue for actions under [Title VII] to the exclusion of the general venue statute"). The Court therefore applies "the more restrictive Title VII [venue provision] to the whole action and will allow venue only if the Title VII venue requirements are met." 17 *Moore's Federal Practice & Procedure* § 110.47; *see* 14D *Wright & Miller's Federal Practice & Procedure* § 3825 (4th ed. 2026).

Finally, as the movant, MSHSAA bears the burden of establishing improper venue. *United States v. Orshek*, 164 F.2d 741, 742 (8th Cir. 1947); *Tobien v. Nationwide Gen. Ins. Co.*, 133 F.4th 613, 620 (6th Cir. 2025) (noting that *Orshek* placed the burden on the defendant to prove that venue is improper); *see* 5B *Wright & Miller's Federal Practice & Procedure* § 1352 (4th ed. 2026) (citing *Orshek* among those cases where courts have placed the burden on defendants). And "[w]hen ruling [on a] Rule 12(b)(3) motion to dismiss for improper venue, [the Court] may consider matters outside the pleadings." *Belaustegui v. KC Media LLC*, No. 4:20-cv-531-CDP, 2020 WL 4805075, *2 n.1 (E.D. Mo. Aug. 17, 2020). Title VII states that such an action "may be brought[,]" in part, "in any judicial district in the State in which the unlawful employment practice is alleged to have been committed." 42 U.S.C. § 2000e-5(f)(3).

"[C]ourts have reasonably read this to mean that any judicial district in the relevant state is a proper venue." 17 *Moore's Federal Practice & Procedure* § 110.47. "An alternative reading . . . would treat the words 'in the State' as surplusage without syntactical effect." *Id.*; 14D *Wright & Miller's Federal Practice & Procedure* § 3825 (4th ed. 2026) ("It is sufficient that the forum district simply be in the same state as that in which the unlawful practice was

committed."); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174–179 (2012) (discussing the surplusage canon). MSHSAA presents no evidence—nor could it—that the Eastern District of Missouri is not a "judicial district in the State in which the unlawful employment practice is alleged to have been committed." *See* 42 U.S.C. § 2000e-5(f)(3); *see generally* docs. 23, 30. The Court therefore finds that venue is proper in the Eastern District of Missouri.

Finally, the Court notes that MSHSAA "repeats, almost *verbatim*[,]" its arguments for dismissal for improper venue in its motion to dismiss the United States' complaint in intervention. Doc. 37 at 1; *see* doc. 34. So as explained, the Court finds that venue is proper in the Eastern District of Missouri. Further, the Eighth Circuit has suggested that "[w]here venue is proper for the original claims by a plaintiff against a defendant and additional claims . . . come in through . . . intervention, a venue objection may be unavailable as to the additional claims." *Bredberg*, 778 F.2d at 1288. For instance, if, like here, "intervention is as of right, existing parties may not object that venue is incorrect as to the intervenor, because the intervenor has a right to participate in the action." 6 *Moore's Federal Practice* § 24.22; 14D *Wright & Miller's Federal Practice & Procedure* § 3808 (4th ed. 2026) (stating that when "additional claims are asserted against parties to the original suit," for instance "claims by or against interveners[,]" then "the better view is that no venue objection should be entertained").

**B. Transfer**

In the alternative, MSHSAA requests that the Court transfer this case to the Western District of Missouri under 28 U.S.C. § 1404(a). Doc. 23 at 19–21; doc. 30 at 4–5. "Section 1404(a) governs the ability of a federal district court to transfer a case to another district." *Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 119 F.3d 688, 691 (8th Cir. 1997). The statute authorizes

the Court to transfer a case to "any district . . . where it might have been brought." 28 U.S.C. § 1404(a). Section 1404(a) directs the Court to consider three factors when deciding a motion to transfer: "(1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the interests of justice." *Terra Int'l.*, 119 F.3d at 691.

These factors, however, are nonexhuastive. *Id.* "[C]ourts have recognized that such determinations require a case-by-case evaluation of the particular circumstances at hand and a consideration of all relevant factors." *Id.* "In general, federal courts give considerable deference to [Plaintiffs'] choice of forum and thus the party seeking a transfer under section 1404(a) typically bears the burden of proving that a transfer is warranted." *In re Apple, Inc.*, 602 F.3d 909, 913 (8th Cir. 2010). "This 'general' practice of according deference, however, is based on an assumption that the plaintiff's choice will be a convenient one." *Id.* The Court therefore turns to the first two factors.

**1. The convenience of the parties and witnesses**

MSHSAA argues that "[t]he parties and the key witnesses are located in the Western District [of Missouri]." Doc. 23 at 20. "MSHSAA maintains its headquarters and sole office in Columbia, Missouri, where all of its employees work[.]" *Id.* (citing doc. 23-1 at ¶¶ 4–5). And Johnson "resides in the Western District [of Missouri]." *Id.* (citing doc. 23-1 at ¶ 18(a)). MSHSAA further argues that "[a]ll documents relevant to this case are located in the Western District." *Id.* (citing doc. 23-1 at ¶ 6). And "MSHSAA maintains its records at its Columbia headquarters, . . . and any documents in Dr. Johnson's possession would be located in the Western District[.]" *Id.* (citing doc. 23-1 at ¶ 6). Finally, Johnson's "eligibility determination was made and communicated from the Western District [of Missouri]." *Id.* (citing doc. 23-1 at

¶¶ 16(a)–(j), 18(a)–(c)). "Taken together," MSHSAA argues, "these considerations show that the Western District is the more convenient forum for the parties, witnesses, and evidence." *Id*.

Plaintiffs respond that "Columbia, while located in the Western District, is centrally located in Missouri—sitting along a major highway and nearly equidistant between St. Louis and Kansas City[,]" Missouri. Doc. 26 at 33. Plaintiffs also argue that MSHSAA "cannot assert [Plaintiffs'] inconvenience in support of a motion to transfer." *Id.* at 33–34 (citation omitted). "As it happens, Plaintiffs deem *this Court* more convenient." *Id.* at 34 (emphasis in original).

MSHSAA responds that "while a plaintiff's choice of forum is generally entitled to consideration, that choice receives diminished deference where, as here, the selected forum lacks a meaningful connection to the underlying controversy." Doc. 30 at 5 (relying on *In re Apple, Inc.*, 602 F.3d at 913); doc. 35 at 14–15. But in *In re Apple*, the Eighth Circuit gave "minimal weight" to a plaintiff's choice of forum only because the plaintiff "hail[ed] from a foreign nation." 602 F.3d at 913. Therefore, the Eighth Circuit found that the assumption that a "plaintiff's choice will be [] convenient" was "much less reasonable." *Id.* But quite different circumstances exist here. The Court therefore finds that MSHSAA hasn't met its burden to show that the convenience of the parties and witnesses outweighs the "considerable deference" given to Plaintiffs' choice of forum. *See Terra Int'l.*, 119 F.3d at 695. The Court next considers whether the interests of justice favor transfer.

**2. The interests of justice**

MSHSAA argues that "[t]he interests of justice similarly point to the Western District as the proper forum." Doc. 23 at 21. Courts may consider the following factors when determining whether transfer is in the interest of justice:

> (1) judicial economy, (2) the plaintiff's choice of forum, (3) the comparative costs to the parties of litigating in each forum, (4) each party's ability to enforce a

> judgment, (5) obstacles to a fair trial, (6) conflict[-]of[-]law issues, and (7) the advantages of having a local court determine questions of local law.

*Terra*, 119 F.3d at 698. Here, MSHSAA argues that "what matters here most is the forum's connection to the dispute and judicial economy." Doc. 23 at 21. MSHSAA avers that the "Western District [of Missouri] has the sole connection to the underlying controversy[,]" and judicial economy favors transfer because "this case is in its early stages." *Id.*

To support its argument that these factors outweigh the "considerable deference" given to Plaintiffs' choice of forum, MSHSAA again cites to *In re Apple, Inc.*, 602 F.3d at 913. *Id.* But as explained, *In re Apple* is inapposite here. The Court therefore finds that MSHSAA hasn't met its burden of showing that the interest of the parties outweighs the "considerable deference" given to Plaintiffs' choice of forum. *Terra Int'l.*, 119 F.3d at 695. Having found that venue is proper in the Eastern District of Missouri and that transfer is unwarranted, the Court turns to address MSHSAA's 12(b)(6) motion to dismiss.

## V. MSHSAA's 12(b)(6) motion

### A. Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The pleading standard of Rule 8(a)(2) requires a plaintiff to give "a short and plain statement . . . showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To meet this standard, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This requirement of facial plausibility means the factual content of the plaintiff's allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Whitney v. Guys, Inc.*, 700

F.3d 1118, 1128 (8th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). The Court must draw all reasonable inferences in favor of the nonmoving party. *Lustgraaf v. Behrens*, 619 F.3d 867, 872–73 (8th Cir. 2010).

When ruling on a motion to dismiss, a court "must liberally construe a complaint in favor of the plaintiff." *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010). But if a claim fails to allege one of the elements necessary to recover on a legal theory, the Court must dismiss that claim for failure to state a claim upon which relief can be granted. *See Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 355 (8th Cir. 2011). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Nor does a "pleading that merely pleads 'labels and conclusions,' or a 'formulaic recitation' of the elements of a cause of action, or 'naked assertions' devoid of factual enhancement" suffice. *Hamilton v. Palm*, 621 F.3d 816, 817–18 (8th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678). Although courts must accept all factual allegations as true, they are not bound to take as true a legal conclusion couched as a factual allegation. *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 677–78.

Only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 679. Therefore, the Court must determine if the well-pleaded factual allegations "plausibly give rise to an entitlement to relief." *Id.* This "context-specific task" requires the Court to "draw on its judicial experience and common sense." *Id.*

### B. Missouri lacks statutory standing to assert a Title VII claim (Count III)

MSHSAA argues that Plaintiffs fail to state a Title VII claim because Missouri is not a "person claiming to be aggrieved" under Title VII. Doc. 23 at 27–28 (citing 42 U.S.C. § 2000e-5(f)(1)); doc. 30 at 11 & n.2. Plaintiffs respond that Title VII "unambiguously contemplates

suits" by Missouri to enforce Title VII's protections on behalf of its citizens. Doc. 26 at 19. They state that 42 U.S.C. § 2000e(a) "defines 'person' to include 'government' and 'governmental agencies.'" *Id.* at 18. And since Title VII authorizes suits by a "person claiming to be aggrieved," 42 U.S.C. § 2000e-5(f)(1), "these provisions clearly authorize the State . . . to bring suit under Title VII." Doc. 26 at 18 (internal quotation marks and citations omitted).

Missouri's statutory standing here is "a straightforward question of statutory interpretation." *Tovar v. Essentia Health*, 857 F.3d 771, 774 (8th Cir. 2017) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014)); *see also Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d 928, 934 (8th Cir. 2012) ("Statutory standing is simply statutory interpretation: the question it asks is whether Congress . . . has accorded *this* injured plaintiff the right to sue the defendant to redress his injury." (quoting *Graden v. Conexant Sys., Inc.*, 496 F.3d 291, 295 (3d Cir. 2007))). "If [the Court] determines that Congress has not provided a statutory cause of action in a particular case, it may be subject to dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim." *Tovar*, 857 F.3d at 774.

Title VII authorizes suits by the Equal Employment Opportunity Commission, the United States Attorney General, or a "person claiming to be aggrieved." 42 U.S.C. § 2000e-5(f)(1); *see Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 173 (2011); *see also Food & Drug Admin. v. R. J. Reynolds Vapor Co.*, 606 U.S. 226, 234 (2025). The parties dispute whether Missouri falls into the latter category: "persons claiming to be aggrieved." Doc. 23 at 27–28; doc. 26 at 18–21. But because Title VII does not grant Missouri a cause of action to seek relief on behalf of its citizens, the Court finds that Missouri is not a "person claiming to be aggrieved." *See* 42 U.S.C. § 2000e-5(f)(1).

Start with the text. Title VII first defines "person" as including "individuals, governments, governmental agencies, [and] political subdivisions." 42 U.S.C. § 2000(e)(a). Then in Title VII's enforcement provision, Congress first "empowered" the EEOC "to prevent any person from engaging in any unlawful employment practice" under Title VII. 42 U.S.C. § 2000e-5(a). Title VII next states:

> Whenever a charge is filed by or on behalf of a person claiming to be aggrieved, or by a member of the Commission, alleging that an employer . . . has engaged in an unlawful employment practice, the Commission shall serve a notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) on such employer, employment agency, labor organization, or joint labor-management committee (hereinafter referred to as the "respondent") within ten days, and shall make an investigation thereof. Charges shall be in writing under oath or affirmation and shall contain such information and be in such form as the Commission requires. Charges shall not be made public by the Commission. If the Commission determines after such investigation that there is not reasonable cause to believe that the charge is true, it shall dismiss the charge and promptly notify the person claiming to be aggrieved and the respondent of its action. In determining whether reasonable cause exists, the Commission shall accord substantial weight to final findings and orders made by State or local authorities in proceedings commenced under State or local law pursuant to the requirements of subsections [2000e-5(c)–(d)]. If the Commission determines after such investigation that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion. Nothing said or done during and as a part of such informal endeavors may be made public by the Commission, its officers or employees, or used as evidence in a subsequent proceeding without the written consent of the persons concerned. Any person who makes public information in violation of this subsection shall be fined not more than $1,000 or imprisoned for not more than one year, or both. The Commission shall make its determination on reasonable cause as promptly as possible and, so far as practicable, not later than one hundred and twenty days from the filing of the charge or, where applicable under subsection [2000e-5(c) or (d)], from the date upon which the Commission is authorized to take action with respect to the charge.

42 U.S.C. § 2000e-5(b). Title VII then explicitly authorizes one more federal governmental actor to enforce Title VII—the United States Attorney General:

> If within thirty days after a charge is filed with the Commission or within thirty days after expiration of any period of reference under subsection [2000e-5(c) or (d)], the Commission has been unable to secure from the respondent a conciliation

> agreement acceptable to the Commission, the Commission may bring a civil action against any respondent not a government, governmental agency, or political subdivision named in the charge. In the case of a respondent which is a government, governmental agency, or political subdivision, if the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission shall take no further action and shall refer the case to the Attorney General who may bring a civil action against such respondent in the appropriate United States district court. The person or persons aggrieved shall have the right to intervene in a civil action brought by the Commission or the Attorney General in a case involving a government, governmental agency, or political subdivision. If a charge filed with the Commission pursuant to subsection [2000e-5(b)] is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference under subsection [2000e-5(c) or (d)], whichever is later, the Commission has not filed a civil action under this section or the Attorney General has not filed a civil action in a case involving a government, governmental agency, or political subdivision, or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice . . . .

42 U.S.C. § 2000e-5(f)(1); *see also* 42 U.S.C. § 2000e-6(a) (providing a separate cause of action for the United States Attorney General to sue "any person or group of persons [that] is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured" under Title VII).

The Supreme Court explained the evolution of the statute thusly: "[p]rior to 1972, the only civil actions authorized other than private lawsuits were actions by the Attorney General upon reasonable cause to suspect 'a pattern or practice' of discrimination." *Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 327 (1980). "These actions did not depend upon the filing of a charge with the EEOC; nor were they designed merely to advance the personal interest of any particular aggrieved person." *Id.* Then, in 1972, Congress amended Title VII to "provid[e] for a[n] [enforcement] suit by the EEOC pursuant to a charge filed by a private party," and to

"transfer[] to the EEOC the Attorney General's authority to bring pattern-or-practice suits on his own motion." *Id.* at 328.

"The 1972 amendments to [section 2000e-5] accordingly expanded the EEOC's enforcement powers by authorizing the EEOC to bring a civil action in federal district court against private employers reasonably suspected of violating Title VII." *Id.* at 325. Thus, Title VII "specifically authorizes the EEOC to bring a civil action against any respondent not a governmental entity upon failure to secure an acceptable conciliation agreement." *Id.* at 324. So "[w]hen the EEOC acts, albeit at the behest of and for the benefit of specific individuals, it acts . . . to vindicate the public interest in preventing employment discrimination." *Id.* at 326. Had Congress intended for states to vindicate, under Title VII as opposed to under their own employment-discrimination regimes, the public's interest in preventing employment discrimination, one would expect Congress to have done so explicitly in the statutory text.

Instead, Title VII "established an integrated, multistep enforcement procedure culminating in the EEOC's authority to bring a civil action in a federal court" against a private employer. *EEOC v. BNSF Ry. Co.*, 150 F.4th 948, 953 (8th Cir. 2025) (quoting *EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657, 672 (8th Cir. 2012)). "First, an employee files with the EEOC a charge alleging that an employer has engaged in an unlawful employment practice." *Id.* (quoting *CRST Van Expedited, Inc.*, 679 F.3d at 672); 42 U.S.C. § 2000e-5(b) ("Whenever a charge is filed by or on behalf of a person claiming to be aggrieved, or by a member of the Commission, alleging that an employer . . . has engaged in an unlawful employment practice . . . .").

"Second, the EEOC is then required to investigate the charge and determine whether there is reasonable cause to believe that it is true." *BNSF Ry. Co.*, 150 F.4th at 953 (quoting

*CRST Van Expedited, Inc.*, 679 F.3d at 672); 42 U.S.C. § 2000e-5(b) ("[T]he Commission shall serve a notice of the charge . . . on such employer . . ., and shall make an investigation thereof."). "If reasonable cause does exist, the EEOC moves to the third step, which attempts to remedy the objectionable employment practice through the informal, nonjudicial means of conference, conciliation, and persuasion." *BNSF Ry. Co.*, 150 F.4th at 953 (quoting *CRST Van Expedited, Inc.*, 679 F.3d at 672); 42 U.S.C. § 2000e-5(b) ("If the [EEOC] determines after such investigation that there is reasonable cause to believe that the charge is true, the [EEOC] shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion."). And, "if unsuccessful, the EEOC may move to the fourth and final step and bring a civil action [against the private employer] to redress the charge." *BNSF Ry. Co.*, 150 F.4th at 953 (quoting *CRST Van Expedited, Inc.*, 679 F.3d at 672); 42 U.S.C. § 2000e-5(f)(1) ("If . . . after a charge is filed with the [EEOC] . . ., the [EEOC] has been unable to secure from the respondent a conciliation agreement acceptable to the [EEOC], the [EEOC] may bring a civil action against any respondent not a government, governmental agency, or political subdivision named in the charge.").

But in a case where the respondent is a public employer and "the [EEOC] has been unable to secure . . . a conciliation agreement acceptable to the" EEOC, then the EEOC takes "no further action" and "refer[s] the case to the Attorney General who may bring a civil action against [the public employer] in the appropriate United States district court." 42 U.S.C. § 2000e-5(f)(1). In short, Congress created "sequential steps in a unified scheme for securing compliance with Title VII" against both private and public entities. *BNSF Ry. Co.*, 150 F.4th at 953 (quoting *CRST Van Expedited, Inc.*, 679 F.3d at 672).

So Title VII explicitly grants a cause of action to three groups: (i) the EEOC, (ii) the United States Attorney General, and (iii) a person aggrieved or claiming to be aggrieved (terms the courts have treated interchangeably, *see Thompson*, 562 U.S. at 176–78; *Clayton v. White Hall Sch. Dist.*, 875 F.2d 676, 679–680 (8th Cir. 1989)). Thus, beyond authorizing suit by the groups that Title VII was designed to protect—i.e., persons subject to unlawful discrimination, *see Thompson*, 562 U.S. at 178—Title VII tasks only two governmental actors with enforcing Title VII: the EEOC and the United States Attorney General. Conspicuously absent from Title VII's reticulated enforcement provisions: "states," or any similar language authorizing states to enforce Title VII.

Yet in several other statutory schemes, Congress expressly authorized states to enforce certain provisions of federal law either on the state's own behalf or on behalf of the state's residents. *See, e.g.*, 7 U.S.C. § 13a-2(1); 11 U.S.C. § 526(c)(3); 12 U.S.C. § 5552(a)(1); 12 U.S.C. § 5538(b)(1); 15 U.S.C. § 15c(a)(1); 15 U.S.C. § 45f(d); 15 U.S.C. § 77p(d)(2)(A); 15 U.S.C. § 6103(a); 15 U.S.C. § 6309(c); 15 U.S.C. § 6504(a)(1). Title VII, in contrast, has no comparable language. The Court thus refuses to supply provisions that Congress omitted. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013) (stating that, given the clear language of Title VII, "it would be improper to conclude that what Congress omitted from the statute is nevertheless within its scope"). Instead, the Court only "construe[s] what Congress has written." *62 Cases, More or Less, Each Containing Six Jars of Jam v. United States*, 340 U.S. 593, 596 (1951). "After all, Congress expresses its purpose by words." *Id.* "It is for [the Court] to ascertain—neither to add nor to subtract, neither to delete nor to distort." *Id.*; *see also* Scalia & Garner, *supra*, at 93–100 (discussing the omitted-case canon).

Second, Missouri's argument renders sections of Title VII superfluous. If Title VII's term of art, "persons claiming to be aggrieved," included all governments, as Missouri argues, then sections §§ 2000e-5(b) and (f)(1) serve no purpose. Under Missouri's reading, Congress had no reason to enact sections §§ 2000e-5(b) and (f)(1), because the EEOC and the United States Attorney General are already "persons claiming to be aggrieved." Yet Plaintiffs' argument fails to consider that Title VII explicitly "empowered" the EEOC to enforce Title VII. 42 U.S.C. § 2000-e(5)(a). And Plaintiffs' argument also fails to consider that Title VII explicitly authorizes the United States Attorney General to sue to enforce Title VII against state actors, 42 U.S.C. § 2000e-5(f)(1), and against "any person or group of persons . . . engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by" Title VII, 42 U.S.C. § 2000e-6. The Court thus declines to entertain an interpretation that renders these provisions superfluous. *Pulsifer v. United States*, 601 U.S. 124, 142 (2024) ("When a statutory construction thus renders an entire subparagraph meaningless . . ., the canon against surplusage applies with special force." (citation modified)); *Wingert & Assocs., Inc. v. Paramount Apparel Int'l, Inc.*, 458 F.3d 740, 744 (8th Cir. 2006) ("A statutory provision should not be interpreted to make other provisions meaningless or superfluous." (citation omitted)); *see also* Scalia & Garner, *supra*, at 174–79 (discussing the surplusage canon).

Third, Missouri's interest in enforcing Title VII is "inconsistent with the purposes [explicit and] implicit in the statute." *Thompson*, 562 U.S. at 178. As noted above, Congress in 1972 amended Title VII to extend its protections to employees of state entities that employ more than 15 people. *Mount Lemmon Fire Dist. v. Guido*, 586 U.S. 1, 4 (2018); *see* 42 U.S.C. §§ 2000e(b), (h). Congress did so pursuant to its authority under section 5 of the Fourteenth Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 447 (1976). And "the central purpose of the

Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States." *United States v. Skrmetti*, 605 U.S. 495, 568 (2025) (Alito, J., concurring in part and concurring in the judgment) (quoting *McLaughlin v. Florida*, 379 U.S. 184, 192 (1964)); *id*. at 554 (Barrett, J., concurring) ("[T]he clear and central purpose of the Fourteenth Amendment was to eliminate all official state sources of invidious racial discrimination in the States." (quoting *Loving v. Virginia*, 388 U.S. 1, 10 (1967))).

But Missouri's interpretation allows states to bypass the "sequential steps in [Title VII's] unified scheme for securing compliance[,]" while forcing those explicitly tasked with enforcement—the EEOC and the United States Attorney General—to comply with various procedural requirements. *See BNSF Ry. Co.*, 150 F.4th at 953 (quoting *CRST Van Expedited, Inc.*, 679 F.3d at 672). In other words, the Court finds untenable Missouri's view that in exercising their explicit statutory enforcement powers, the EEOC and the United States Attorney General must comply with reticulated procedural requirements, 42 U.S.C. §§ 2000e-5, 2000e-6, yet in exercising what can only be implicit enforcement powers, states are unburdened by any such procedural requirements whatsoever.

While Missouri doesn't quite ask the Court to find an elephant hiding in a mousehole, *see Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), its ask is akin to finding a hound hiding in a rabbit hole. If Congress had wanted states to have standing to enforce Title VII, it wouldn't have left it to be inferred from the interstices of the statute. Instead, Congress would've plainly stated it in the text, as it did for the EEOC and Attorney General, and as it did in the myriad other statutes in which it expressly granted states statutory standing.

Consider next Title VII caselaw, which buttresses the Court's textual analysis. The Supreme Court explained that the phrase "person claiming to be aggrieved" is a "term of art" that

"must be construed more narrowly than the outer boundaries of Article III." *Thompson*, 562 U.S. at 177; *see also R. J. Reynolds Vapor Co.*, 606 U.S. at 233–34. The Supreme Court interpreted the phrase consistent with its usage in the Administrative Procedure Act context to mean that Title VII authorized suit by "any plaintiff with an interest 'arguably [sought] to be protected by the statute.'" *Thompson*, 562 U.S. at 178 (alteration in original) (quoting *Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 495 (1998)); *see also R. J. Reynolds Vapor Co.*, 606 U.S. at 233–34. This test excludes "plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions in Title VII." *Thompson*, 562 U.S. at 178; *see also R. J. Reynolds Vapor Co.*, 606 U.S. at 233–34.

The parties dispute the "zone of interests" that Title VII protects. MSHSAA argues that the Title VII's zone of interests "protect[s] employees and applicants from adverse employment actions based on unlawful considerations." Doc. 23 at 27 (citing *Starbucks*, 2026 WL 309714 at *14); *see Thompson*, 562 U.S. at 178 (describing "the purpose of Title VII" as "protect[ing] employees from their employers' unlawful actions"). And like in *Starbucks*, MSHSAA argues that, while "[Missouri] is neither an employee nor applicant for employment who has faced discrimination or retaliation by MSHSAA," Johnson is. Doc. 23 at 27; *see Starbucks*, 2026 WL 309714 at *16. But Johnson chose not to raise a Title VII claim. *See generally* doc. 1; *see also* doc. 30 at 12 n.3. MSHSAA therefore argues that Missouri cannot "shoehorn the complaints of private citizens into their own cause of action against [MSHSAA]." Doc. 23 at 27 (quoting *Starbucks*, 2026 WL 309714, at *16).

Plaintiffs, in response, argue that Title VII protects a "broader" zone of interests. Doc. 26 at 18–21. They cite several Eighth Circuit cases that state that "Title VII is a remedial statute intended "to eliminate the inconvenience, unfairness, and humility of racial discrimination." *Id.*

(first quoting *Parham v. Sw. Bell Tel. Co.*, 433 F.2d 421, 425 (8th Cir. 1970); then citing *Sedlacek v. Hach*, 752 F.2d 333, 337 (8th Cir. 1985); then citing *Clayton v. White Hall Sch. Dist.*, 875 F.2d 676, 679 (8th Cir. 1989); and then citing *Baker v. Stuart Broad. Co.*, 560 F.2d 389, 391 (8th Cir. 1977). Particularly relevant, Plaintiffs cite *Clayton*, where the Eighth Circuit stated that Title VII's zone of interests should "be accorded a liberal construction in order to carry out the purpose of Congress to eliminate the inconvenience, unfairness and humiliation of racial discrimination." *Clayton*, 875 F.2d at 679 (quoting *Parham*, 433 F.2d at 425). Plaintiffs therefore assert that Title VII's "zone of interests" encompasses Missouri's "interest in stopping discrimination by" MSHSAA. Doc. 26 at 20.

But contrary to Plaintiffs' assertion that "[t]his case is nearly identical to *Clayton*," *id.*, *Clayton* cannot bear the weight Plaintiffs place on it. In *Clayton*, the Eighth Circuit held that a white, female employee who alleged injury from a "racially discriminatory work environment" was "aggrieved" under Title VII because "[her] interest in a work environment free of racial discrimination" is "within the zone of interest protected by Title VII." *Id.* at 679–80. But *Clayton* doesn't stretch beyond an *employee's* interest. *See Tovar*, 857 F.3d at 775 ("[T]he statute prohibits employers from discriminating against employees on the basis of their protected characteristics."). While Plaintiffs' allegations sufficed to establish an Article III injury necessary for Missouri to raise its other constitutional claims, *supra* Part III.B., *Clayton* does no work to establish that Missouri's "interest [is] 'arguably . . . protected by'" Title VII, *Thompson*, 562 U.S. at 177–78 (quoting *Nat'l Credit Union Admin.*, 522 U.S. at 495); *see also R. J. Reynolds Vapor Co.*, 606 U.S. at 234.

And while Plaintiffs cite no binding authority that Title VII's "zone of interests" is broad enough to encompass Missouri's "interest in stopping discrimination by" MSHSAA, *see* doc. 26

at 20, *Tovar* suggests otherwise. In *Tovar*, a mother sought coverage for certain medications and gender-reassignment surgery for her son. *Tovar*, 857 F.3d at 773. Her insurance company denied her requests for coverage. *Id.* Tovar sued the insurance company alleging "sex[-]based discrimination in violation of Title VII." *Id.* Tovar cited *Thompson* as "recognizing the right of an employee, who had not himself engaged in protected activity, to bring a claim under Title VII." *Id.* at 777 (citing *Thompson*, 562 U.S. at 172–73). The Eighth Circuit held that "*Thompson* . . . fails to establish that the protections of Title VII extend to an employer's discrimination against an employee's beneficiary who does not have an independent relationship with the employer." *Tovar*, 857 F.3d at 777.

Title VII's substantive antidiscrimination provisions therefore do not protect the rights of a *nonemployee*, who has not engaged in a protected activity, i.e., Missouri, from bringing a Title VII claim. Thus, even under *Clayton*'s broad formulation of Title VII's zone of interests, *Clayton*, 875 F.2d at 679, no Eighth Circuit precedent supports Missouri's attempt to "shoehorn [Johnson's allegations] into [its] own cause of action against [MSHSAA]," *see Starbucks*, 2026 WL 309714, at *16.

In sum, Missouri isn't an employee of MSHSAA. *Cf. Clayton*, 875 F.2d at 679; *Tovar*, 857 F.3d at 776. Nor is Missouri acting as an authorized proxy for MSHSAA's employees or applicants, like a labor union, which may bring Title VII claims on behalf of employees. *See Int'l Woodworkers of Am., AFL-CIO, CLC v. Ga.-Pac. Corp.*, 568 F.2d 64, 66–67 (8th Cir. 1977). So if "the purpose of Title VII is to protect employees from their employers' unlawful actions," *Thompson*, 562 U.S. at 178, on the facts of this case, Plaintiffs are incorrect that the Eighth Circuit interprets Title VII—which is silent on a state's statutory standing—to include states as a party with statutory standing.

And while the Supreme Court has said that the zone of interests test is "not especially demanding," it has also "made clear" that the "breadth of the zone of interests varies according to the provisions of law at issue." *Lexmark Int'l, Inc.*, 572 U.S. at 130 (citation modified). The Court also recognizes that the zone of interests test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized that plaintiff to sue." *Id.* (citation modified); *Thompson*, 562 U.S. at 178. But this doesn't mean Missouri's argument necessarily succeeds.

For instance, in *Newport News*, the Supreme Court decided that "the Director of the Office of Workers' Compensation Programs in the Department of Labor" was not an aggrieved person "under the Longshore and Harbor Workers' Compensation Act." *R. J. Reynolds Vapor Co.*, 606 U.S. at 234 (quoting *Dir., Off. of Workers' Comp. Programs, Dep't of Lab. v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 126–29 (1995)). The Supreme Court considered whether the interest the Director sought to vindicate was "*arguably* within the zone of interests to be protected or regulated by the statute." *Id.* at 234 (citation modified) (quoting *Newport News*, 514 U.S. at 126–27). And after "[c]onsidering the 'long lineage' of this language," the Supreme Court "found it telling that neither we nor any court of appeals had ever held, under the APA or otherwise, that an agency, in its regulatory or policy-making capacity, is 'adversely affected' or 'aggrieved.'" *Id.* (cleaned up) (citing *Newport News*, 514 U.S. at 127).

The Court finds it equally telling that Plaintiffs identify no Supreme Court or intermediate appellate cases that held that a state's interest in "protecting its citizens" and "stamping out discrimination" makes it a "person claiming to be aggrieved" under Title VII. *See* doc. 26 at 20–21; 42 U.S.C. § 2000e-5(f)(1). Again, just because the Court found that Missouri's

quasi-sovereign interest in "protecting its citizens" and "stamping out discrimination" sufficed for Article III standing under the *parens patriae* doctrine does not mean that Missouri has statutory standing to assert a Title VII claim. *See R. J. Reynolds Vapor Co.*, 606 U.S. at 234 (citing *Thompson*, 562 U.S. at 177). The two are not equivalent. *Miller*, 688 F.3d at 934 (stating that the "issue of *statutory* standing . . . has nothing to do with whether . . . a case or controversy [exists] under Article III, and [courts] are careful not to conflate the two" (citations omitted)); *see Magdy v. I.C. Sys., Inc.*, 47 F.4th 884, 890 (8th Cir. 2022) (stating that Article III standing and statutory standing are "two separate standing-related inquiries"). The Constitution and other federal statutes may allow Missouri to bring certain federal claims on behalf of its citizens, but neither the statutory text of Title VII nor related caselaw supports finding that Congress granted a right of action, either expressly or by clear implication, for Missouri to specifically bring Title VII claims on behalf of its citizens. *See* 42 U.S.C. § 2000e-5(f)(1); *Thompson*, 562 U.S. at 177–78; *62 Cases*, 340 U.S. at 596–97.

Whether a state ever could have statutory standing under Title VII is a question the Court need not address, but the Court concludes that the state lacks statutory standing here. The Court therefore grants MSHSAA's motion to dismiss Plaintiffs' Title VII claim for failure to state a claim upon which the Court can grant relief.

### C. Plaintiffs fail to state a section 1981 claim (Count IV)

Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. In short, "[s]ection 1981 prohibits purposeful racial discrimination.]" *Zar v. S.D. Bd. of Exam'rs of Psychs.*, 976 F.2d 459, 467 (8th Cir. 1992).

MSHSAA argues that both Johnson and Missouri cannot assert § 1981 claims for race and sex discrimination for three independent reasons: (i) "Plaintiffs cannot maintain a freestanding [s]ection 1981 claim," (ii) "[s]ection 1981 does not reach sex discrimination," and (iii) "Plaintiffs fail to allege a specific law or proceeding of which they were denied the full and equal benefit." Doc. 23 at 29–32. Plaintiffs then concede that its "[s]ection 1981 claim does not rest on allegations of sex discrimination." Doc. 26 at 23 n.2; *but see* doc. 1 at ¶ 149. So the Court turns to address MSHSAA's remaining arguments as applied to Plaintiffs' § 1981 claim for race discrimination.

In *Onyiah v. St. Cloud State Univ.*, the Eighth Circuit affirmed the district court's dismissal of plaintiff's "freestanding § 1981 claims." 5 F.4th 926, 929–30 (8th Cir. 2021). The Eighth Circuit noted that it has "repeatedly recognized the prohibition on freestanding § 1981 claims against state actors." *Id.* The Eighth Circuit therefore held that "[t]he district court correctly dismissed Oniyah's freestanding § 1981 claims." *Id.* Plaintiffs acknowledge *Oniyah*'s holding but argue that "this holding is expressly abrogated by *Johnson v. City of Shelby*, 574 U.S. 10 (2014) (per curiam)." Doc. 26 at 24 n.3. But the Eighth Circuit decided *Oniyah* seven years *after* the Supreme Court issued its opinion in *Johnson*. Plaintiffs cite no case law that supports that the Eighth Circuit overturned *Oniyah*. *See* doc. 26 at 23–24; *Sack v. City of St. Louis*, No. 4:23-cv-00952-SEP, 2025 WL 2780912, at *7 (E.D. Mo. Sep. 30, 2025) (dismissing a freestanding section § 1981 claim under *Oniyah*).

The Court also disagrees with Plaintiffs' contention that the Court is applying a "heightened-pleading rule." Doc. 26 at 24. Plaintiffs pleaded a § 1983 claim for race and sex

discrimination in Count I. Doc. 1 at ¶¶ 98–125. Plaintiffs separately pleaded a § 1981 claim for race and sex discrimination in Count IV. *Id.* at ¶¶ 145–52. The Eighth Circuit has held that district courts should dismiss "freestanding § 1981 claims" against state actors. *Oniyah*, 5 F.4th at 929–30. The Court therefore grants MSHSAA's motion to dismiss Plaintiffs' freestanding § 1981 claim.

The Court notes that Plaintiffs—in their response brief—sought leave to amend their complaint if the Court agreed with MSHSAA's position. Doc. 26 at 24 n.4. But Plaintiffs cannot move for leave to amend in a response brief. *See, e.g.*, *Meehan v. United Consumers Club Franchising Corp.*, 312 F.3d 909, 913–14 (8th Cir. 2002) (no abuse of discretion in denying leave to amend where the plaintiff, in their response brief to the motion to dismiss, sought to amend the claim but did not file a motion for leave to amend). "All civil litigants are required to follow applicable procedural rules." *Id.* at 914; *see* E.D.Mo. L.R. 4.07; Judge's Requirements at 4.

## VI. Conclusion

Accordingly, the Court denies MSHSAA's [31] motion to stay. The Court grants MSHSAA's [22] motion to dismiss in part. The Court therefore dismisses Count III with prejudice and Count IV without prejudice. The Court denies MSHSAA's [34] motion to dismiss the United States' complaint in intervention.

So ordered this 17th day of September 2026.

STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE